IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>MADISON S. HILL,<br><br>　　　　　　Defendant. | 8:23CR155<br><br>FINDINGS AND RECOMMENDATION |

　　　　This matter is before the Court on the Motion to Suppress Statements and Request for Hearing (Filing No. 26) filed by Defendant, Madison S. Hill. Defendant seeks suppression of statements he gave to law enforcement during his custodial interview on June 7, 2023. Defendant filed a brief (Filing No. 27) in support of the motion. The government filed a brief (Filing No. 31) in opposition to the motion, in which it states it does not intend to offer any of Defendant's statements for which he seeks suppression during its case-in-chief.

　　　　The Court held a pre-hearing status conference on the motion with counsel on November 9, 2023, and held an evidentiary hearing on December 7, 2023. (Filing No. 33; Filing No. 35). Defendant was present at the evidentiary hearing with his attorney, Richard H. McWilliams. The government was represented by Assistant United States Attorney, Lecia E. Wright. The Court received into evidence, without objection, the government's Exhibit 1, which is the audio-video recording of Defendant's interview, and Defendant's Exhibits 101 to 103. Robert Morrell (Det. Morrell), a detective with the Papillion Police Department and a task force officer with the FBI violent crimes unit, and Adam Barcal (Det. Barcal), a detective with the Omaha Police Department (OPD) in the robbery unit, testified at the hearing. A transcript (TR.) of the hearing was prepared and filed on January 16, 2024. The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied.

## BACKGROUND

　　　　On May 20, 2023, Det. Morrell and Det. Barcal became involved with an investigation of a robbery at Access Bank at 203 North 180th Street during the initial law enforcement response. Det. Morrell interviewed bank staff members, and learned one witness had a GoPro and followed the suspect from the bank. From that video, Det. Morrell was able to "get a clear picture" of the

suspect vehicle and license plate number. Defendant was identified as the suspect of the robbery by a confidential informant (CI) and by a Crime Stoppers tipster. (TR. 8-9, 18-19, 24).

On May 28, 2023, Defendant was arrested by OPD officers on drug charges. At the time of his arrest, Defendant was driving a vehicle the CI stated the CI had sold to Defendant. Law enforcement had previously placed a tracking device on the vehicle as part of the bank robbery investigation. However, Det. Barcal testified that the arresting officers, who were part of a separate unit within the OPD, did not know Defendant and his vehicle were being tracked as part of the robbery investigation, and Defendant's arrest was the result of a "random stop." (TR. 9-10, 24-27, 32; 102-103). Defendant appeared in state court for the drug charges on June 1, 2023, and was appointed an attorney within the Douglas County Public Defendant's Office to represent him. At the time, Defendant had not been arrested or charged in connection with the bank robbery. (TR. 38-39; Ex. 101).

Shortly after 5:00 p.m. on June 7, 2023, Det. Morrell and Det. Barcal transported Defendant from the Douglas County jail to an interview room at the Omaha Police Headquarters to interview him as part of the robbery investigation. The detectives did not know whether Defendant was represented by counsel at the time. Neither detective recalls having a conversation with Defendant during the approximately two to three-minute drive to the interview room. (TR. 10-12, 20, 22).

Prior to the interview, Det. Barcal and Det. Morrell "briefly" discussed their approach to the interview but did not "have a solid game plan." Det. Morrell surmised Det. Barcal "would probably play the good cop better" if they decided to "do a good cop/bad cop scenario." Det. Barcal testified he believed he communicated his opinion they should conduct more of a "softball" interview and not "browbeat" Defendant. Det. Morrell testified he believed Defendant's actions and words reflected he was "more than willing to talk to me" after the *Miranda* advisement. Det. Barcal testified Defendant "was adamant wanting to talk to us." (TR. 13-14, 21-22).

The undersigned magistrate judge has reviewed the audio-video recording of Defendant's interview at Exhibit 1. During the interview, Defendant was seated in the small room wearing an orange prison jumpsuit and was not handcuffed or restrained. Det. Morrell and Det. Barcal sat across from Defendant in front of the door. Det. Morrell and Det. Barcal were both armed with their firearms visible. Det. Morrell testified he just under six-four and weighs about 265 pounds. (TR. 15-16).

When Det. Barcal first walked into the interview room at approximately 5:17 p.m., he handed Defendant a water and indicated they would get him a Coke. Det. Morrell introduced himself and stated he was with the FBI task force for violent crimes. Defendant interrupted Det. Morrell and asked him, "What you here for?" Det. Morrell responded, "That's what we're here to talk about." Defendant replied, "I thought y'all was some drug people." Det. Morrell asked, "Other than the situation you are here for now, what do you think we're here for?" Defendant answered, "Nothing." Det. Morrell replied, "You wouldn't have any idea or inclination as to why Detective Barcal and I would want to talk to you?" Defendant shook his head in the negative. Det. Morrell then stated:

> Before I ask you any questions, I want to just say that you have a very small window of opportunity to talk to us today and to say what it is you need to get off your back because it ain't gonna come again. At least not with us. And you have been in the system. You know a little bit of somethin' you know how it works all right so I'm not gonna play ya, I'm not gonna play games with you. One of the things that we need to do is find out –

Defendant interrupted Det. Morrell and asked, "What y'all trying to do? Take down my hood or something?" Det. Morrell replied, "Well no. I'm gonna advise you of your rights. Let's just start there." Det. Morrell then administered a *Miranda* rights advisory. Det. Morrell asked Defendant if he understood his rights and whether he would waive them, and Defendant responded, "Yes. Come on, man. Come on, man. Just come on. Come on. Get to the nitty gritty, dog. We sittin' around nit picking. You know what I'm saying? I'm like, what's up?"

The detectives then spoke to Defendant for a total of approximately 18 minutes, during which they informed Defendant they wanted to speak to him about a bank robbery. Defendant denied knowing anything about a bank robbery and stated, "So, I can't help y'all. So, if that's what you want to talk about, we can't talk." Det. Morrell told Defendant he had lied, and the interview became contentious and confrontational, with both Det. Morrell and Defendant raising their voices and yelling. Det. Barcal asked Defendant questions about drugs and his children. Det. Morrell told Defendant the interview was his one chance to tell his story, to which Defendant replied, "Fuck your chance." Det. Morrell set a folder with photographs on the table, and Defendant knocked it to the ground stating, "Fuck that shit." Det. Barcal indicated one of the pictures in the folder was of Defendant and explained how they knew, and Defendant stated, "I'll see you on Wednesday." Defendant asked Det. Barcal, "What time is it?" and when Det. Barcal replied it was about 5:30

3

p.m., Defendant said, "Time to go. I don't want to miss my trays" and indicated he would see them on the 28th, which was the date of Defendant's next state court hearing. Det. Morrell replied he would see him on a different date because the 28th was for his "other shit." Defendant stated, "Bro, stop talking to me about that. Stop talking to me about that. There's nothing to talk about."

Det. Morrell continued to confront Defendant about his inability to explain the bank surveillance photos. Det. Barcal suggested various reasons why people rob banks, including funding a drug habit. Defendant replied:

> I can't help you with this at all. I can't explain it. We gotta go so I don't miss my trays. Dude, come on, bro. Dude come on, bro. I'm not trying to sit here all day. … I already said what I thought you was here for and this ain't that for one at all. This shit lame as hell. I thought we was about to have a discussion about something.

Det. Barcal replied, "If that stuff isn't you, then help me prove it is not you." Defendant challenged him to prove it. At approximately 5:34:28, Defendant stated, "Bro, alright, I gotta go. I'm done talking. Can I have a lawyer?" In response, Det. Barcal replied, "Absolutely." Det. Morrell stated it was Defendant's "chance" and they would prove their case. Defendant said, "Well then prove your case. You don't gotta do shit like this." Det. Morrell then began yelling at Defendant for approximately minute, during which Defendant makes no statements, and then the detectives concluded the interview by walking out of the room at 5:35 p.m. (Exhibit 1).

On June 29, 2023, the undersigned magistrate judge signed a Criminal Complaint and arrest warrant for Defendant for violations of 18 U.S.C. § 2113(a), bank robbery, and for 18 U.S.C. § 924(c), Use of a Firearm in Furtherance of a Crime of Violence. On July 18, 2023, a grand jury returned a two-count Indictment charging him with the same. (Filing No. 1).

Defendant has now filed the instant motion to suppress the statements he gave to law enforcement on June 7, 2023, asserting his statements were improperly obtained: (1) involuntarily under the Fifth Amendment and 18 U.S.C. § 3501; (2) without affording Mr. Hill his Sixth Amendment right to counsel; (3) before advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); (4) after Defendant invoked his right to remain silent; and (5) after Defendant invoked his right to counsel. (Filing No. 26 at p. 2).

Defendant argues his statements were involuntary because the detectives yelled, refused his several requests to return him to jail, threatened to have him federally indicted if he did not cooperate, implored him to "think about his kids," did not stop asking him questions after he invoked the right to remain silent, and because "[t]he officers were armed and the water was

4

warm." (Filing No. 27 at pp. 8-9). Defendant asserts his Sixth Amendment right to counsel was violated because he had been appointed a lawyer to defend him in his state drug case, and the detectives interrogated Defendant about drugs, which questions "were inextricably intertwined with the questions about the robbery." (Filing No. 27 at pp. 10-11). As to Defendant's *Miranda* violation argument, Defendant asserts Det. Morrell "asked at least two questions designed to elicit incriminating responses and then delivered a speech intended to prompt [Defendant] to confess" prior to the *Miranda* advisement, although Defendant acknowledges he "didn't make too many incriminating statements . . . but it wasn't for lack of Det. Morrell's trying." (Filing No. 27 at pp. 11-12). Finally, Defendant asserts the detectives ignored his repeated unequivocal invocation of his right to remain silent regarding the robbery, and his request for counsel was ignored because Det. Morrell "launch[ed] into a tirade designed to elicit an incriminating response or persuade [Defendant] to reconsider his position." (Filing No. 27 at pp. 13-14).

The government asserts Defendant's motion should be denied because the government does not intend to offer any of Defendant's statements during its case-in-chief. Regardless, the government maintains Defendant's statements were voluntary, and contends Defendant's Sixth Amendment right to counsel was not violated because Defendant was charged with and appointed counsel for drug charges, not robbery charges. The government argues Defendant was not interrogated before *Miranda* warnings, and asserts officers scrupulously honored Defendant's only unequivocal request that he was "done talking." The government also asserts Defendant's statements would be admissible for impeachment if necessary. (Filing No. 31; TR. 5).

**ANALYSIS**

As an initial matter, the government has represented in both its brief (Filing No. 31) and at the evidentiary hearing (TR. 5) that it does not intend to use any of Defendant's statements in its case-in-chief. It has generally been the practice of the judges within this district, and the practice of other district courts within this circuit, to deny as moot motions to suppress when the government agrees not to offer the contested evidence in its case-in-chief. See, e.g., *United States v. Mitchell*, No. 08-CR-46-LRR, 2009 WL 36605, at *2 (N.D. Iowa Jan. 5, 2009) ("[A]s a practical matter, there does not appear to be a significant difference between granting the Motion or denying it as moot based on the government's representation that it will not offer the evidence during its case in chief . . . It appears that rather, when the government agrees not to offer evidence which is

5

the subject of the motion to suppress, the common practice is to deny the motion as moot"); *United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822925, at *1 (D. Minn. Nov. 22, 2010), *aff'd in part*, 702 F.3d 1092 (8th Cir. 2013) ("Because the government had agreed not to use in its case in chief [the defendant's] statements whose suppression the magistrate judge recommended, the Court denies as moot [the defendant's] motion to suppress those statements"); *United States v. Rooney*, No. 8:20CR104, 2021 WL 1931149, at *5 (D. Neb. Feb. 12, 2021), *report and recommendation adopted*, No. 8:20CR104, 2021 WL 1232743 (D. Neb. Apr. 2, 2021), *aff'd*, 63 F.4th 1160 (8th Cir. 2023) (recommending denial of motion to suppress as moot based upon the government's representations that it will not use Defendant's statements in its case-in-chief). Because the government agrees not to use any of Defendant's statements in its case-in-chief, the undersigned magistrate judge recommends Defendant's motion should be denied as moot on that issue.

Nevertheless, although this analysis is not necessary to resolve the instant motion, briefly, the undersigned magistrate judge finds neither Defendant's Fifth nor Sixth Amendment rights were violated. The Sixth Amendment right to counsel "is offense specific," and "encompass[es] offenses that, even if not formally charged, would be considered the same offense under the *Blockburger*[1] test." *Texas v. Cobb*, 532 U.S. 162, 173 (2001). Here, Defendant's state drug charges for which he was appointed counsel share no overlapping elements with the instant federal charges for bank robbery and use of a firearm in furtherance of a crime of violence. Therefore, Defendant's Sixth Amendment right to counsel was not violated in this case.

Defendant's Fifth Amendment rights were also not violated. Defendant concedes he did not make incriminating statements prior to receiving *Miranda* warnings, and he clearly waived his rights under *Miranda* after being provided with a full rights advisory when he responded, "Yes. Come on, man. Come on, man. Just come on." Defendant also did not clearly and unequivocally invoke his right to remain silent until he said he was "done talking. Can I have a lawyer?" An invocation of the right to remain silent requires a "clear, consistent expression of a desire to remain silent." *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016). Defendant's statements he wanted to leave so he did not "miss my trays" is an expression of a desire to go somewhere else, not an unambiguous assertion of the right to remain silent. See *United States v. Simpson*, 44 F.4th

---

[1] In *Blockburger v. United States*, 284 U.S. 299 (1932), the court explained that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

1093, 1097 (8th Cir. 2022), *reh'g denied*, No. 21-2463, 2022 WL 4295416 (8th Cir. Sept. 19, 2022), and *cert. denied*, 143 S. Ct. 813 (2023) (finding suspect's "repeated statements that he wished to go home were not unambiguous invocations of his right to remain silent."). Defendant's statements saying, "So, if that's what you want to talk about, we can't talk," "Fuck your chance," "stop talking to me about that," and "there's nothing to talk about," all while continuing to engage with the detectives, were equivocal or ambiguous statements that did not clearly and unequivocally invoke his right to remain silent. See, e.g., *Adams*, 820 F.3d at 320 (finding the defendant's statement, "Nah, I don't want to talk, man. I mean, I," was ambiguous when the defendant proceeded to further engage and continued to talk for sixteen more minutes). Here, when Defendant stated he was "done talking" and asked for a lawyer Det. Barcal replied, "Absolutely," and neither detective asked Defendant any more questions. See *Edwards v. Arizona*, 451 U.S. 477 (1981) (law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation); *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966) (interrogation must cease once individual indicates he "wishes to remain silent). Det. Morrell's subsequent statements—not questions—elicited no incriminating responses from Defendant. Therefore, after review, Defendant made no statements requiring suppression for violation of his Fifth Amendment rights.

The government maintains the interview did not violate Defendant's rights, but even if the Court made that determination, the government asserts his statements would be admissible for impeachment because his statements were voluntary. (Filing No. 31 at p. 12).

Although statements taken in violation of the prophylactic Fifth Amendment *Miranda* rules or in violation of the Sixth Amendment right to counsel cannot be used as substantive evidence, they may still be admissible to impeach the conflicting testimony of a defendant. See *Kansas v. Ventris*, 556 U.S. 586, 594 (2009) (holding statement elicited in violation of the Sixth Amendment was admissible to challenge inconsistent testimony at trial); *Michigan v. Harvey*, 494 U.S. 344, 344 (1990) ("Voluntary statements taken in violation of Fifth Amendment prophylactic rules, while inadmissible in the prosecution's case in chief, may nevertheless be used to impeach the defendant's conflicting testimony."); *Harris v. New York*, 401 U.S. 222, 224 (1971) (holding voluntary statements that were inadmissible under *Miranda* may be used as impeachment). It is only when a defendant's statements are involuntary that they must be excluded for all purposes. See *New Jersey v. Portash*, 440 U.S. 450, 459 (1979); *Mincey v. Arizona*, 437 U.S. 385, 389 (1978).

7

A court must look at the totality of the circumstances and consider, among other things, the conduct of the officers and the characteristics of the accused, to determine whether a statement was voluntary or compelled. See *United States v. Daniels*, 775 F.3d 1001, 1004-05 (8th Cir. 2014) ("We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition."). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Simpson*, 44 F.4th at 1097 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, do not render a confession involuntary . . . unless the overall impact of the interrogation caused the defendant's will to be overborne." *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (internal quotation marks omitted) (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005). "Cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984)).

Defendant argues his statements were involuntary because the detectives yelled at and browbeat him, refused his several requests to return him to jail, threatened to have him federally indicted for robbery if he did not cooperate, asked him to "think about his kids," did not stop asking him questions after he invoked the right to remain silent, and because "[t]he officers were armed and the water was warm." (Filing No. 27 at pp. 8-9). But, in considering the totality of the circumstances and after review of the interrogation, the undersigned magistrate judge finds Defendant's will was not overborne so as to render his statements involuntary.

Here, Defendant is an English-speaking adult that appeared of at least average intelligence based upon his apparent understanding of, and appropriate responses to, the detective's questions. Defendant also has prior criminal history and experience with law enforcement, evidenced by his rushing through the *Miranda* rights advisory stating, ""Yes. Come on, man. Come on, man. Just come on. Come on. Get to the nitty gritty, dog." Although the detectives were armed, they were wearing plain clothes and did not brandish their weapons or physically threaten or intimidate

Defendant. True, Det. Morrell did raise his voice and the tone of the conversation with Defendant became heated and somewhat hostile; however, Defendant held his own and cursed and yelled at the detectives himself, challenged the officers to prove their case, knocked the detectives' file off the table, and largely resisted the interrogation tactics employed by the detectives. And, as recognized by both parties, Defendant made few, if any, actually incriminating statements as to the charges levied against him in this case. The interview was fairly short, lasting approximately 18 minutes until Defendant stated he was "done talking. Can I have a lawyer?" Under the circumstances, the undersigned magistrate judge concludes Defendant's statements were voluntary, and would be admissible for impeachment. See, e.g., *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011) (finding "little in the record to suggest" a defendant's will was overborne where the relatively brief interview lasted 43 minutes, investigators were not physically aggressive, "they did not create any more psychological pressure than is commonly associated with interrogations," and where the defendant was an adult of average intelligence with experience with the criminal-justice system). Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that Defendant's Motion to Suppress Statements and Request for Hearing (Filing No. 26) be denied.

Dated this 9th day of February, 2024.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.