IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>MADISON S. HILL,<br><br>              Defendant. | 8:23CR155<br><br><br>MEMORANDUM<br>AND ORDER |

      On July 18, 2023, defendant Madison S. Hill ("Hill") was indicted on one count of bank robbery, in violation of 18 U.S.C. § 2113(a), and one count of using or carrying a handgun during and in relation to that crime, in violation of 18 U.S.C. § 924(c)(1)(A). Hill later moved to suppress (Filing No. 26) statements he made during an interview with Omaha Police Department ("OPD") Detective Adam Barcal ("Detective Barcal") and Papillion Police Department Detective and Federal Bureau of Investigation Violent Crimes Task Force member Robert Morrell ("Detective Morrell," and together "the detectives"). The Court referred Hill's motion to a magistrate judge,[1] who held a hearing at which he received evidence, heard testimony from the detectives, and considered the parties' arguments. *See* 28 U.S.C. § 636(b)(1) (authorizing the Court to designate a magistrate judge "to hear and determine" non-dispositive pretrial matters and to issue "proposed findings of fact and recommendations for the disposition" of motions to suppress); *accord* Fed. R. Crim. P. 59(b).

      Now before the Court is Hill's Statement of Objections (Filing No. 43) to the magistrate judge's Findings and Recommendation (Filing No. 41) recommending that Hill's motion to suppress be denied. *See* 28 U.S.C. § 636(b)(1)(C) (requiring the Court conduct a de novo review of the objected-to portions of a magistrate judge's findings or

---

[1]The Honorable Michael D. Nelson, United States Magistrate Judge for the District of Nebraska.

recommendations); *see also* Fed. R. Crim. P. 59(b)(3). In light of Hill's objections, the magistrate judge's Findings and Recommendation is accepted in part and denied in part for the reasons that follow. Based on the record, the Court denies Hill's motion as moot as to the introduction of the challenged statements in the government's case-in-chief and denies his motion on the merits as to the potential use of his statements for impeachment purposes.

I. BACKGROUND[2]

On May 20, 2023, a robbery occurred at Access Bank on North 180th Street in Omaha, Nebraska. Both Detective Morrell and Detective Barcal responded and assisted in the initial investigation of the robbery. Among other things, the detectives gathered information by interviewing bank staff and viewing a video that one of the witnesses took while following the robber from the bank. Based on this information, as well as two tips received regarding the incident, the detectives identified Hill as a suspect.

Five days after the robbery, Detective Barcal applied for and obtained search warrants in relation to the investigation. First, he sought the results of a search by the Nebraska Juvenile Probation Office of locational data from ankle-monitor devices issued to individuals on probation, believing that search would turn up evidence of either Hill or his suspected associates at locations related to the offense. Detective Barcal also applied for a search warrant allowing him to install a global-positioning system ("GPS") tracking device on the Chevy Tahoe an informant[3] stated was being driven by Hill.

---

[2]Hill has made around two dozen objections related to facts he contends are relevant and omitted from or misstated in the magistrate judge's Findings and Recommendation. Through its de novo review, the Court has carefully ensured it has included or clarified those objected-to facts that are supported by the record.

[3]Detective Barcal testified that he did not know whether this informant had worked with other units at OPD "to develop information about [] Hill unrelated to [the] robbery investigation."

A judge of the District Court of Douglas County, Nebraska ("district court"), approved Barcal's warrant applications on May 25, 2023, permitting the use of the tracking device "for a period of 30 days." That same day, OPD officers installed the tracking device.

In the early morning hours of May 28, 2023, OPD Officers August Hogan ("Officer Hogan") and Noah Zendejas ("Officer Zendejas," and together "the officers") conducted a traffic stop of the Chevy, which was occupied by Hill and parked along North 40th Avenue in Omaha, Nebraska. According to the arrest affidavit, the officers observed a bag of marijuana in the console of the car when they approached Hill. They also "locat[ed] another clear plastic baggy of marijuana" upon removing Hill from the vehicle. The officers then searched the Chevy, finding more bags of marijuana, cash, a scale, cocaine, and fentanyl pills.

The officers arrested Hill and read him his warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1996). The arrest affidavit also indicates the officers notified other individuals at OPD of the arrest including Sergeant Wright and "CIB"[4] Dostal.

Sometime within the next ten days, Detective Barcal received notice of Hill's arrest. Though Detective Barcal testified he believed "Officer Zendejas informed [him] via email," he later clarified he was not sure how he came to learn of the arrest. Detective Barcal testified, however, that, in his position with OPD, he generally had the ability to access internal arrest reports and look up the status of pending criminal cases.

Detective Barcal testified that he later spoke to Officer Hogan who confirmed that neither of the officers had prior knowledge of the robbery investigation involving Hill and that the stop of the vehicle was unrelated to its tracking for that purpose. Detective

---

[4]The record does not define the meaning of "CIB," but Hill suggests this portion of the arrest affidavit demonstrates the OPD Criminal Investigations Bureau was contacted regarding his arrest.

3

Barcal also testified that he did not know how many officers had access to the tracking information for Hill's car.

On May 31, 2023, the state filed a Criminal Complaint against Hill in the County Court of Douglas County, Nebraska ("county court"), for possession with intent to distribute cocaine, fentanyl, and marijuana, in violation of Neb. Rev. Stat. § 28-416(1), (2)(a)-(b), and (7)(c), as well as failure to affix a tax stamp to a controlled substance, in violation of Neb. Rev. Stat. § 77-4309. On June 1, 2023, Hill appeared before the county court where an Assistant Douglas County Public Defender was appointed to represent him on the state charges. Bail was set at $100,000.

Meanwhile, the bank-robbery investigation continued. On June 6, 2023, Detective Barcal notified the district court that he had obtained the ankle-monitor data from the Nebraska Juvenile Probation Office as well as the GPS tracking data of the Chevy for the dates May 25, 2023, through May 27, 2023.

Hill had been in jail for ten days when, on June 7, 2023, he was transported to OPD headquarters and placed in an interview room. Detective Barcal testified that, by that time, he was aware that Hill was arrested and in jail on the drug charges but had not checked the status of that case.

The ensuing interview was recorded by cameras installed in the interview room. The Court has thoroughly reviewed the footage from those cameras, in its entirety, several times throughout its de novo review of the matter. At the beginning of that footage—which is marked as 5:14 p.m.—Hill sat alone in the room for about three minutes. The detectives then arrived with a glass of water for Hill, identified themselves, and sat down about two feet away from him. The detectives wore plain clothes and were armed, with their weapons holstered at their hips.

Hill immediately asked the detectives "what [they were] [t]here for," to which Detective Morrell responded, "That's what we're here to talk about." Hill added that he

4

"thought [they were] some drug people." Detective Morrell promptly replied, "Maybe I should ask you then, other than the situation you're here for now, what do you think we're here for?" "Nothing," Hill said.

Detective Morrell then put a recording device on the table adjacent to Hill while asking again if Hill had "any inclination" why he and Detective Barcal "would want to talk to" him. Hill shook his head from side to side.

Detective Morrell prodded Hill, "Before I ask you any questions, you have a small window to talk to us today and, to say what it is you need to get off your back, because it isn't going to come again—at least not with us." At this point, Hill drank some water and appeared to fidget and gesture. Detective Morrell continued to tell Hill that he knew he had been in the "system" and that he would not play games with him. Hill retorted, "What y'all trying to do, take down my hood or something?"

Taking a step back from the developing conversation, Detective Morrell replied, "Well, no. I'm going to advise you of your rights because I need to ask you some questions. So let's just start there." He began to read Hill his *Miranda* warnings, which Hill confirmed he understood. Hill then interrupted Detective Morrell's ongoing explanation, urging, "Come on, get to the nitty gritty . . . what's up?" Detective Morrell explained he needed to go through the formalities and confirm that Hill was willing to talk to the detectives.

Detective Morrell again asked Hill why he thought the detectives were there to speak with him. Hill responded, "What? The shit last summer when I got shot?" Detective Morrell clarified the incident in question didn't happen last summer but last month. Hill replied, "Well, then I don't fucking know," shrugging and seeming to become agitated.

Detective Morrell then asked Hill where he was on May 20th, to which Hill said he "couldn't tell [them]" but that he was probably with his sister. Hill suggested to the

5

detectives that they "knew his dad" and other members of his family. Detective Morrell continued, "I'm here to ask you to tell us what it is you need to get off your back," saying he had "no doubt" that Hill knew why the detectives were there to speak with him.

Hill then explained he thought the detectives were there in relation to the drug charges and would ask him "to do a couple of controlled buys." Detective Morrell replied that wasn't why the detectives were there, but again evaded further explanation of the circumstances. That response irritated Hill, who began clapping and spoke in an irate tone, "Then tell me why you're fucking here." Detective Morrell responded in kind, "Did you have anything to do with robbing a fucking bank?"

Hill immediately shut down any such involvement, "No! Robbing a fucking bank and can't get out for $12,000? Fuck outta here . . . I don't have no fucking money." Detective Morrell sat silent for a moment then quietly responded that Hill did not "have to be so mad" at him and that he didn't know why Hill was so upset. Hill clarified he was upset "because [he was] broke." Hill and Detective Morrell continued to snap at each other over Hill's financial situation.

The men sat silently for a moment while Hill looked down. Detective Morrell began again, this time asking him squarely if he had "anything to do with a robbery in West Omaha on May 20th." Though telling Hill he expected him to say he had nothing to do with the robbery, Detective Morrell asked Hill if he was ever in that part of town. Hill mumbled, "Not really." Upon further questioning, Hill said the last time he was out in West Omaha was probably about six or seven months before when he "stole liquor from" a HyVee grocery store.

Hill continued to insist that he had not since been in the area for any reason and asked why the detectives thought he had. Detective Morrell dangled the carrot yet again, "If you want, I'll get to the why." But instead of telling Hill any details about their suspicions, he continued to tell Hill that he would hope he would tell the detectives

6

himself about the robbery to "get it off his chest," and informed him that if "he lied to [the detectives] he [would] burn bridges."

Hill again said he would help the detectives by doing a drug sale, but Detective Morrell told him they needed him "to talk to [them] first" about the bank robbery. Hill responded that he didn't know anything about it, and that if that's what the detectives wanted to discuss then "he [couldn't] help [them]" and that "they [couldn't] talk."

Detective Morrell then accused Hill of lying to the detectives, which Hill firmly denied. Detective Morrell doubled down, saying Hill lied to them about not being in West Omaha recently. After Hill maintained that he had not been in the area, Detective Morrell told him they had proof he had. Frustrated, Hill said, "Well go ahead with the proof." As Detective Morrell continued, Hill expressively gestured and urged him to show him the proof. When Detective Morrell asked what he would say if the detectives had the proof, Hill responded, "I would say I don't know, I was high." Hill sat back in his chair and rested his head on his hand.

Detective Barcal then began to tell Hill that he would want to "keep this at the state level," to which Hill perceptively replied that bank-robbery charges would not be kept at the state level but would likely be pursued federally. Detective Morrell and Hill went on to vigorously argue this point, leaning toward each other but remaining about two feet apart.

Confirming Hill "said [he was] a dope user," Detective Barcal began to ask Hill a variety of questions about his drug use. Hill freely responded to Detective Barcal's questions about his years-long history using fentanyl pills, the price of those pills, and his fears of overdosing. Hill told Detective Barcal that being high for long periods of time made him subsequently "hate" himself because he has kids. That comment prompted Detective Barcal to ask more about Hill's children and relationships with his family members.

7

After Hill told Detective Barcal more about his family, he turned to Detective Morrell and accused him of already "knowing everything" about him. Detective Morrell didn't deny that fact but said he would rather Hill tell the detectives that information anyway. To this, Hill told Detective Morrell he would rather not play games and repeated that he had already tried to help the detectives by agreeing to "snitch" on others by participating in controlled drug sales. Bank robbery, Hill informed the detectives, wasn't even his style.

The men had now been speaking for ten minutes. When Hill said OPD already knew "enough about" him to know that bank robbery wasn't his "style," Detective Morrel snapped his fingers at Hill. "You're deflecting, we're not talking about that. We're talking about bank robbery," Detective Morrell said. Hill again insisted he had nothing to do with that and that he knew people who were locked up for bank robbery but that wasn't his style. When Detective Barcal asked him who he knew who was imprisoned for bank robbery, Hill taunted and mocked him, "Who? Who?," leaning closer to Detective Barcal.

"This ain't gonna help your case," Detective Morrell sniped. Hill responded, "There is no case. There won't be a case. Then show me the fucking case. There ain't none or else they would've indicted me already." When Detective Morrell said he will "show" him the case, Hill began raising his voice more, hollering, "Why am I not indicted then?"

As Hill grew more irate, Detective Morrell sat forward in his chair, leaning near Hill and pointing his finger at him. He informed Hill he was in a "a very delicate spot." "There's been an investigation for a month straight . . . you get one chance to tell your story," Detective Morrell told Hill. The men continued shouting at each other. "Fuck your chance," Hill responded.

8

Detective Morrell then leaned down to pick a folder up from the ground near his chair and told Hill to listen to him carefully, "You want to know what's in this thing? You said you haven't been west . . ." Hill interrupted, telling Detective Morrell again, "Fuck your one chance. Did you hear me? Fuck your one chance." Detective Barcal pleaded with Hill to calm down.

Detective Morrell placed the folder on the table adjacent to Hill, which Hill immediately smacked off the table. As the folder hit the ground, documents peaked out of it. Hill picked up the folder and began looking through the photos inside. As he flipped through the papers, Detective Barcal asked him to return to one of the photos he had passed, pointing at the piece of paper in question as it was in Hill's hand.

Hill continued to act like he didn't understand what the photos demonstrated as he and Detective Barcal looked at them together, leaning in closer to each other. Finally, Detective Barcal asked, "Who is that?" Hill replied, looking at the photo, "That? What does that mean?"

"That's you," Detective Barcal declared. Detective Morrell took this opportunity to finally address their suspicions directly, telling Hill they knew the photos were of him: "We have a storyline, an exact storyline . . . that puts you at the scene of the crime all the way back to the casinos where you were spending money with your sister." Detective Morrell leaned into Hill and raised his voice as he revealed his theory. Hill continued to rifle through the papers. "I didn't want to have to tell you that if you were to just say, 'Fuck man, I screwed up.' But you lied to us," Detective Morrell added.

Hill calmly leaned back in his chair and looked downward. He drank from his water and became quiet. Detective Morrell, meanwhile, continued to raise his voice at Hill, telling him he "knew what the fuck [he was] doing" and wasn't on drugs when he purportedly committed the bank robbery. Hill shrugged.

Leaning on the edge of his seat and gesturing at Hill, Detective Morrell continued to yell, "You want to be the tough guy, you can do that in jail." Hill again laid back in his chair, shrugging and looking away as Detective Morrell spoke. Throwing his hands up in a defeated manner, Hill repeated, "I'll see you on Wednesday.[5] I'll see you on Wednesday." Detective Morrell continued to lean closer into Hill, tipping his chair near him and parsing through the papers on the table. "You're telling me you had nothing to do with this bank robbery . . . . We got all of this information," Detective Morrell said, going through some of the facts the detectives believed linked Hill to the crime.

"Do you want to lay down and die? And I say that figuratively because that's what you're doing," Detective Morrell added, sitting back in his chair again. Hill again shrugged, putting his hands up in frustration. Hill told the detectives, "That's what I'm saying . . . . I understand that, I get all that." He then promptly turned to Detective Barcal and asked for the time. Detective Barcal told Hill it was about 5:30 p.m., to which Hill immediately said it was "time to go" because he didn't "want to miss [his] trays" for dinner.

When the detectives said they would help with his trays, Hill expressed doubt, saying, "I didn't even get no Coke, I got lukewarm water. I'll see you on the 28th." Detective Morrell clarified that Hill would actually "see [him] at a different time because the 28th [was] for [his] other shit." "You're going to have to deal with this one on another day, son . . . and it's going to be whenever you least expect it," Detective Morrell told Hill.

Detective Barcal continued at Hill, "You're a fentanyl user. We've been doing bank robberies for a long time." Hill interrupted firmly, "Stop talking to me about that. Stop talking to me about that. There's nothing to talk about." Detective Barcal persisted,

---

[5]Hill's statements regarding "Wednesday" and later mention of "the 28th" likely refer to a then-scheduled hearing in county court related to Hill's drug charges.

10

"Well, I need to talk to you. Let me finish, ok?" Hill turned his face away from the detectives.

"People do bank robberies for dumb stuff," Detective Barcal said. Hill interrupted again, "There's nothing to talk about." In a calm tone, Detective Barcal again continued,

> Let me finish. People do bank robberies. I've seen it done for habits like gambling. I've seen it done to pay off debt. I've seen it done to go buy guns. We don't think that's what you were doing. Were you high? Maybe. But that looks a lot better in front of a judge, saying, 'You know what? I have a problem with fentanyl. I do. I fucked up. I'm a slave to it. I'm a man, I can own up to it. I did this under fentanyl.' That looks a whole lot better than a malicious [reason]. And that's why I want to talk about it.

Detective Morrell added, now in a softer tone, "I've seen some bad apples, but you're not the worst of them." Hill stood his ground again, telling them "Okay, but I cannot help y'all with this at all . . . . I can't explain nothing. I can't explain nothing." Detective Morrell responded, "Why don't you want to explain?" Hill replied, "Because I can't." The men went back-and-forth on this point again.

Hill again said it was time to go, "We gotta go so I don't miss my trays." Detective Barcal said his name in a disappointed tone, further frustrating Hill.

Detective Barcal persisted, telling him, "[Detective Morrell] said you have an opportunity. You need to start thinking about your kids . . . . We can take stuff federal . . . ." Hill clasped his hands together and rubbed them, repeating, "I don't care." "You want this to stay state," Detective Barcal said. Detective Morrell promptly threatened Hill, "I will take it federal." Hill raised his voice, telling the detectives they could "send [him] with his dad"—seemingly, to federal prison. Detective Barcal repeated to Hill that he needed to "start thinking about his kids."

Hill clapped his hands, telling the detectives, "I already said what I thought I was here for and this ain't that at all. You know what I'm saying? That shit lame as hell. You

11

know what I'm saying? You feel me? . . . I thought we was about to have a discussion about something and y'all don't even really want to."

Detective Barcal responded, "If this stuff isn't you then help me prove it's not." Frustrated and leaning on the front of his chair, Hill snapped, "Well can you prove it is?" When Detective Barcal responded that he could, Hill raised his voice, "Well then do it." Hill and Detective Morrell momentarily argued, their voices again raised. Detective Morrell explained to Hill why the detectives needed to speak to him as part of their investigation.

Hill looked at Detective Morrell and said, calmly and firmly, "I'm trying to go. I'm done talking. Can I have a lawyer?"

Detective Morrell threw his hands up and said, "Absolutely." While leaning into the table and picking up the photos, he added, "That was your chance buddy." Detective Morrell appeared to turn the recording device off, continuing, "We got a lot more people to draw up on this. We'll let them know that you don't want to talk to us. You know what I'm saying? That's fine. It's real easy for us to prove our case. What's not easy is . . ."

At this point, Hill interrupted, "To prove your case, you don't gotta do shit like this." Detective Morrell shouted,

> Oh really? I don't have to interview the suspect? What fucking planet are you on? I'm not asking any more questions but that's bullshit. I will question anybody and everybody. I will have a pound of fucking evidence. I will have DNA and fingerprints. I'll have fucking cameras all across the country. And I'm still gonna interview that motherfucker so that he can set his spirit free and do something smart for himself. Because you ain't gonna have another opportunity to do that and you just fucking blew it by Mirandizing. So have fun back in jail. We're gonna have a nice little ride back. You can sleep on this shit tonight. Cause I'm sure you fuckin' enjoy the photo lineup. So sit tight. Drink your warm water.

12

Near the end of Detective Morrell's tirade, about seventeen minutes after the interrogation began, both of the detectives stood up, collected their papers, and left the interview room. Hill sat in the room alone for several minutes until Detective Barcal returned, presumably to bring him back to the jail.

On June 29, 2023, a criminal Complaint was filed against Hill in this matter. He was later indicted on July 18, 2023. On October 6, 2023, Hill moved to suppress the entirety of his statements made to the detectives during the June 7 interrogation, asserting they were obtained, "1) involuntarily under the standards established by the Fifth Amendment and 18 U.S.C. § 3501; 2) without affording [him] his Sixth Amendment right to counsel; 3) before advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); 4) after [he] invoked his right to remain silent; and 5) after [he] invoked his right to counsel."

The government opposed suppression (Filing No. 31), stating it "does not intend to use any of Hill's statements in its case in chief" but that the motion should be denied on the merits anyway "because none of his rights were violated." The magistrate judge held an evidentiary hearing on the motion on December 7, 2023, at which he received exhibits from both parties and heard the detectives' testimony.

On February 9, 2024, the magistrate judge issued his Findings and Recommendation, recommending the Court follow the general "practice of the judges within this district, and the practice of other district courts within this circuit, to deny as moot motions to suppress when the government agrees not to offer the contested evidence in its case-in-chief." He then went on to explain that, "although . . . not necessary to resolve the instant motion," he believed Hill's rights under the Fifth and Sixth Amendments to the United States Constitution were not violated.

Hill has since made a number of factual objections to that Findings and Recommendation and further objects that (1) the motion is not moot because "a case or

13

controversy exists here," (2) the detectives did not follow proper procedure in resuming questioning after Hill possibly invoked his right to remain silent on May 28, 2023, (3) the detectives violated Hill's right to counsel in asking him questions about the bank robbery and drug offenses in tandem, and (4) Hill's statements during the interrogation were given involuntarily. The government argues his "objections should be overruled and the [Findings and Recommendation] should be adopted by" the Court (Filing No. 44).

## II. DISCUSSION

### A. Mootness

Hill first objects that the magistrate judge erred in concluding his motion was moot based on the government's present agreement not to use Hill's statements during its case-in-chief. Hill asserts that determination was made in reliance "upon anecdotal common practice" and "no substantive law." Under Article III of the United States Constitution, he argues, a case or controversy exists so long as the government asserts the statements were not made in violation of Hill's Fifth and Sixth Amendment rights and ought to be admissible "even if [it] presently doesn't intend to" use them at trial.

The Court overrules that objection. Importantly, the term "moot" is used in this context "in its colloquial sense, not in an Article III sense." *United States v. Patel*, 2023 WL 6937413, at *1, n.1 (9th Cir. Oct. 20, 2023) (unpublished memorandum opinion). Although Hill finds the case law wanting for substance, federal courts have adopted a widespread procedural practice of denying motions to suppress as moot when the government agrees not to introduce the challenged statements at trial. *See*, *e.g.*, *United States v. Duran-Colon*, 252 F. App'x 420, 423 (2d Cir. 2007) (unpublished per curiam) (concluding the defendant's motion to suppress "became moot . . . when the government determined not to offer" the challenged statements); *United States v. Cota-Herrera*, 75 F. App'x 695, 699 (10th Cir. 2003) (unpublished) (stating the district court acted properly in concluding the defendant's motion to suppress "was moot as the government did not seek to introduce into evidence any of [his] statements taken before he was informed of his *Miranda* rights"); *see also United States v. Martin*, 15 F.4th 878, 883 (8th Cir. 2021)

14

(affirming the district court's denial of the defendant's motion to suppress as moot "after the Government committed that it would not use the evidence at trial" while suggesting the district court could have alternatively "grant[ed] the motion as unopposed or defer[ed] ruling until the issue was raised at trial").

Hill provides no compelling reason to depart from the usual course here. He does, however, raise a number of genuine concerns about the potential path that lays ahead should the government change its mind. Those circumstances are not presently before the Court for determination, but the Court is confident that—should they arise—it can duly consider any constitutional and fairness issues presented should the government attempt to admit any of the challenged statements at trial.

The Court therefore accepts the magistrate judge's recommendation that his motion be denied as moot as to the introduction of the challenged statements in the government's case-in-chief, without prejudice to Hill's ability to challenge their admissibility in the future.

For this same reason, though, the Court rejects the magistrate judge's alternative conclusions that Hill's Fifth and Sixth Amendment rights were not violated by the detective's tactics. The Court need not reach those conclusions as they are not determinative as to whether any of Hill's statements may be introduced for impeachment purposes. *See Kansas v. Ventris*, 556 U.S. 586, 594 (2009) (concluding statements "elicited in violation of the Sixth Amendment" right to counsel may be admissible for impeachment purposes); *Harris v. New York*, 401 U.S. 222, 226 (1971) (holding a statement obtained in violation of *Miranda* may be admissible for impeachment purposes); *see also Michigan v. Harvey*, 494 U.S. 344, 350-53 (1990); *Oregon v. Hass*, 420 U.S. 714, 722-23 (1975).

### B. Voluntariness

But the inquiry does not end there. The government contends Hill's statements remain "available for the limited purpose of impeachment," while Hill argues his statements were involuntary and are therefore wholly inadmissible. The Court must therefore carefully consider the totality of the circumstances surrounding the June 7 interrogation to determine whether Hill's statements were made voluntarily. *See Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978) (stating "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law"); *United States v. Monteer*, 83 F.4th 1119, 1123 (8th Cir. 2023). "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004).

The central question in evaluating voluntariness "is whether the defendant's will was overborne." *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *see also United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022). To answer that question, the Court examines "both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *Monteer*, 83 F.4th at 1123 (quoting *Sandell*, 27 F.4th at 630). "[T]he degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition" are all relevant factors. *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)).

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Magallon*, 984 F.3d at 1284 (quoting *LeBrun*, 363 F.3d at 724). But the mere use of common interrogation "tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," does not render a confession involuntary where the

16

defendant's will is not overborne. *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005).

After careful review, the Court agrees with the government that it has met its burden to show, "[a]lthough the interview was contentious, [Hill] made his statements voluntarily." To Hill's point, several circumstances aggravated the conditions under which he was interviewed. The detectives were armed and seated just a couple of feet away from Hill, who was already in custody. Detective Morrell raised his voice throughout much of the interview and spoke harshly to Hill in multiple respects. Detective Barcal also pleaded with Hill multiple times to think about his children and consider admitting to the bank robbery while getting some sympathy from the Court due to his substance use. Further, the detectives persisted after Hill repeatedly insinuated he was not willing to talk about the bank robbery.

On the other hand, "[t]he interview was comparatively brief," lasting less than twenty minutes. *See Boslau*, 632 F.3d at 429. While the men were seated close to each other, the detectives never appear physically threatening to Hill. Further, Hill "was an adult of" at least average intelligence and "already had some experience with the criminal-justice system," having recently been arrested on drug charges and making some statements demonstrating his knowledge of the system (for example, regarding the likelihood of state bank-robbery charges). *Id.* at 429. Hill also was advised of and understood his *Miranda* rights, first, at the time of his arrest a week earlier and, second, early—even if not at the very outset—into the June 7 interview. *See United States v. Adams*, 820 F.3d 317, 324 (8th Cir. 2016) (concluding the defendant's waiver of his right to remain silent was voluntary where "the officers used no coercive tactics, Adams knew his rights, and he was familiar with police interrogations, having successfully invoked his right to remain silent two weeks earlier").

In light of all of the circumstances, the record does not suggest that Hill's "will and capacity for self-determination" were overborne. *LeBrun*, 363 F.3d at 726 (calling

17

this standard "very demanding"). Despite the detectives' tactics to apply pressure to Hill, his demeanor and responses to the detectives remained relatively firm and seemingly confident. Throughout the interview, Hill cursed, shouted, and at times taunted the detectives. He also insisted he had nothing to say about the bank robbery even after the detectives' persistent questions and pleas for him to say more. Put simply, there is no evidence in the record demonstrating Hill was physically or emotionally coerced by the detectives' relatively brief questioning.

The Court therefore agrees with the magistrate judge that the statements made by Hill in the interview were voluntary and appear to be potentially admissible for impeachment purposes depending on the circumstances presented at trial. Accordingly, based on the Court's careful de novo review of the record in this matter,

IT IS ORDERED:
1. Hill's objections (Filing No. 43) are sustained in part and overruled in part.
2. The magistrate judge's Findings and Recommendation (Filing No. 41) is accepted in part and rejected in part as set forth in this Memorandum and Order.
3. Hill's Motion to Suppress (Filing No. 26) is denied.

Dated this 25th day of March 2024.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge

18